Case number 20-7047, David L. de Susper et al. versus Republic of Hungary, a foreign state et al. And case number 20-8001, Hungary, Republic of Hungary et al. petitioners. Mr. Stauber for the balance, Ms. Beninati for the appellees. Good morning. May it please the court. Good morning. Thaddeus Stauber on behalf of the Hungarian parties and my colleague Sarah Andre on the brief. Plaintiffs advise the Supreme Court that they included Hungary as a defendant for good reason. Not only is Hungary the primary wrongdoer in this case and owner of the artworks, but petitioner will face serious obstacles to enforcing a favorable judgment if Hungary is dismissed from the suit. Upon this, we agree. And now, with Hungary found immune, the Supreme Court in Pemintel and this court in Kickapoo instruct us that the Rule 19 analysis is more circumscribed, not somewhat circumscribed, as a district court below mistakenly stated. And as such, there is very little room for balancing of other factors, because immunity may be viewed as one of those interests compelling by themselves. To end Ron Pemintel in Kickapoo, the plaintiff sought to add a new party upon remand, MNV, the successor to what the lower court stated was a governmental entity, aka Hungary, known as the Treasury Asset Department. But by plaintiff's own expert's admission, MNV's core functions are the same as the Treasury Asset Department, that is, management of state property. A core function, which, as Garbin versus Republic of Poland tells us, is indisputably governmental activity. I understand your point that the management of government property, that's the core function of MNV, but don't we have to look at what property we're talking about? I mean, this isn't military property. It's not a government public building. This is an art museum, right? And how can you make the argument that managing an art museum and an art collection is a core government function? I mean, governments don't have to have art collections, and there are many private ones. Your Honor, yes, there are many private art collections. And in this particular case, the interest at issue here is not the management of the museum. It's not the management of an art collection. It is the ownership, the ownership of historically important property that is part of that state's national collection. Your point's well taken. It's ownership. I agree with you. But what we're talking about here is ownership of artworks. Yes, Your Honor. Pardon me? Go ahead. Why is that a core governmental function? The core function test looks not necessarily at what the property is or necessarily how the property is conducted. But the fact that we have M&V handling state property, not just artwork, but it's real estate, it's contracts. And we look at Trencero tells us. Well, actually, you know, actually, if you look at if you look at the declaration from plaintiffs' experts, it looks like everything M&V does is commercial. They operate transport. They own transport companies. A gambling service provider, an energy group kind of goes on and on. Yes. And the Trencero case tells us. It just seems as if M&V is what M&V owns are properties that are predominantly commercial. And I don't actually have to get around that. I mean, I understand. I understand your rule 19 under your rule 19 argument. We don't even have to address this question. Correct. Correct. Your Honor. I want to correct. Let's let's stick with this for a minute. Sure. I just need to know how an entity like M&V can be considered. We've heard we've held it. You know, the Second Circuit held that. What was it? The Polish foreign ministry was was core government. That makes sense. We held in Trencero that an air force's core government in in the Argentina case, they said bonds were not. So this seems more like commercial. It's a kind of thing that a government doesn't have to do and that others can. In the context here, Your Honor, we have to look at the situation in Hungary. Hungary is a former communist country under the communist era from 1947 to 1989. All property was state property. There were no private property rights. So potentially this property, this artwork is not owned by M&V. M&V solely manages this property. This property is owned and always has been owned by the Hungarian state. That's not in dispute here. And so what M&V is doing. I thought that was the underlying issue in dispute, actually. Well, yes, Your Honor. The underlying issue in dispute is who owns the property? Is it Hungary? The Hungarian state? Is it the plaintiffs? There is it's indisputable. And if the plaintiffs properly own it, then the holders, the museum and the asset management corp are illegally holding it. Right. But in order to do that analysis, Your Honor, the rule 19 tells us that you have to have the Hungarian state, the owner in interest in the case. They are immune. They are no longer in the case. What confuses me about this entire thing is your suggestion that somehow rule 19 can override what the FSIA says about who gets immunity, who is an agency, who is a proper defendant in this way. I don't understand what you mean. I know we have this world of rule 19 in terms of who is considered to be a defendant. The court has held that Hungary is immune. But the FSIA, I thought, has a definition of agency or instrumentality that M&V satisfies. And so for the purpose of figuring this out, why isn't it enough to say M&V is an agency or instrumentality within the meaning of the statutory provision in the FSIA? And we can, I guess, figure that out with the help of the core functions test as well. But I'm just confused about why rule 19 is somehow taking precedence over the FSIA. Sure, Your Honor, let me try to address that for you. We're not saying that rule 19 is taking precedence over the Foreign Sovereign Immunity Act. In fact, what we contend is that they are symbiotic, that they actually speak in consistently with each other. What Pemintel and this court in Kickapoo tells us is when you have a foreign sovereign that has been found immune and is not subject to the jurisdiction of this court, right, then we do a much more circumscribed test to determine if their interests are protected. Under the Foreign Sovereign Immunity Act, working with Judge Tatel's assumption that M&V is subject to the jurisdiction of this court, what the lower court found was that it was a juridically separate and distinct entity from the Hungarian state. Therefore, it could be in the case. But now the question is under the rule 19 analysis, even if you have M&V in the case, we still have to be concerned about the interests of the immune sovereign. And in this particular case, M&V is not accused or alleged in the claim to have done anything, not to have injured the parties, not to have owned the property, the same as with the museums. So the substantive question, the underlying question we have to analyze is who owns the property? And M&V- That's the merits, Mr. Stauber. And the question is who's in the case till we get there? And so under rule 19, I guess the question is, yes, Hungary has interests that may be impaired under the first inquiry, but then we move to the second inquiry and we ask, as the district court did, in equity and good conscience, can the case proceed? And given that, as I think everybody agrees, the Asset Management Corporation is at least an agency and instrumentality of Hungary. Given what the district court held about the alignment of its interests in litigation with those of Hungary, why isn't that a virtue rather than a vice in that it'll be there, the case can proceed, and Hungary's interests are fully represented through M&V? I'm glad you brought that up, Your Honor. The question of interest, as rule 19 tells us, is not an interest in the outcome. Yes, we would agree with the court that M&V, the Hungarian state, and the museums all have a shared interest. They all want to see this case dismissed. They all want to see Hungary's ownership affirmed. But rule 19 doesn't tell us to look at the shared interest in the outcome. It tells us to look at the interest in the subject of the case. And the subject of the case is ownership. And the only party on the defendant's side, and even conceded by the lower court and the plaintiffs, is that Hungary is the owner. That is the interest that is disputed here. Not whether you get to manage the property, not whether you get to display the property. So when the court did that analysis, it, by definition, and this is subject to de novo review, applied the wrong law so that it was able to then construct a situation where M&V, perhaps no different than the Department of Justice, or the Solicitor General, is substituted for the United States government in a property dispute and says, well, since we can take jurisdiction over you, you've got to now sit in the place of the substantive property owner. I think that analysis seems to not really acknowledge the extent to which Hungary created M&V to hold its assets in this way. It's not like the Justice Department, you know, that it's a totally separate thing doing something that has nothing to do with Hungary in this sense. So maybe you can tell us, first of all, your understanding of why Hungary opted in the 1990s to create an independent corporate structure to manage its assets. And let me just say before you answer that question, I mean, the thing that troubles me about the way that you've just described it is that you're suggesting that M&V is sort of not a real party and interest in any meaningful sense because it never did anything. But it was created by the party that you concede would be the right defendant for this purpose to hold the assets and to manage the assets that are in dispute in this case. So I don't think it's sort of an innocent bystander and oh my goodness, what is it doing here? So tell me, why was it created? The M&V, as we understand it, was created for the purpose of managing the Hungarian state holdings in an efficient and effective way to fulfill the objectives and the priorities of the Hungarian state. It acts at the direction of the Hungarian state. It takes its orders from the Hungarian state, which is why we submit, back to Judge Tatel's question, that M&V and the Hungarian state are one in the same. Okay, so given that, why isn't Judge Pillard's point about the equities which play into Rule 19, right? Why doesn't that answer our question? You want to then use Rule 19 to cleave them and suggest that M&V is not properly in this because it's not the Hungarian state, but you've just admitted, with respect to this question, that they're one in the same. So fine, then the equities would say as long as we have M&V, regardless of the immunity of the Hungarian state, we should go forward, right? Your Honor, we concede that question for purposes of the FSIA analysis. We don't otherwise concede that question. But in the context of Rule 19, M&V cannot provide the relief that is requested. If this case were to proceed and there was a decision against M&V and against the museums, M&V does not have the authority to turn over the property. Wait, hold on. Could you just finish that sentence completely? I'd like to hear the complete end of that sentence. M&V does not what? M&V does not have the authority, absent the direction of the Hungarian state, to turn over or alienate the property according to Hungarian statutes. M&V does not have its own budget. All of the funding for M&V comes from the Hungarian treasury. Can I just drill down on this? Yes, Your Honor. So there could be two kinds of judgments. One judgment could be return the property. And your point there is that the property belongs to Hungary, not M&V, correct? Yes. Okay. Number two, suppose it's a money judgment. Doesn't M&V have? I mean, M&V is a huge operation. It's got hundreds of employees. It operates many businesses. Are you saying it could not pay a money judgment? It could not, Your Honor. How do we know that in this record? We know that in this record from the declaration of the legal director of M&V, Dr. David Cratchwell, that was submitted to this court, which states that M&V, all of the funding for M&V comes from the Hungarian state treasury, the Hungarian state budget. It does not have its own budget. It's part of the national budget. So if there is a money judgment of $100 million against M&V, it will be paid out of the Hungarian treasury. I understand. The same applies to the museums. Okay. While we're on this subject of Rule 19, I want to ask you about your interpretation of Pementel. You say in your brief that the district court, and this is a quote, quote, ignored Pementel's mandate, close quote, when it examined the 19b factors. So is it your position that under Pementel, if you have a foreign sovereign that enjoys immunity and its claims are not frivolous, that the court has to dismiss the case? Is that your reading of Pementel? No, Your Honor, it's not. But our reading of it is that foreign sovereign immunity is a sacrosanct principle of dignity and comedy. And so that when the court says to do an analysis... I'm asking you specifically about, I'm quoting from your brief. Yes, Your Honor. You said they ignored the mandate when it examined the Rule 19b factors. That tells me that you think that Pementel holds that once you have a foreign sovereign with a non-frivolous case claim, that that's the end of things. And I want to know whether that's in fact the way you read Pementel. Or does the district court still have an obligation to look at the 19b factors, even though that examination might be, as you said, circumscribed? Which is it? We think that the district court must apply a more circumscribed approach. When we say the mandate, we are saying that the Supreme Court has stated that sovereign immunity in and of itself can be enough. And that can be the full stop in this case, which we submit it should have been. But when you then go look at the factors, inequity and good conscience, you have to weigh and provide greater weight to that sovereign immunity, which was not done in this particular case. But can I just finish my line of questions? Absolutely. He's just the court. The court goes on and says that what's wrong here? He says it has to be dismissed where there is a potential for injury to the absence of sovereign. That tells me that just because there's an absence of sovereign with a non-frivolous argument, the courts still has to focus on whether there's a potential injury to the absence of sovereign. Correct? Correct, Your Honor. And in this particular case, it's not a potential injury. It's an immediate injury and it's a real injury. Okay. So you agree that the court does have to look at the question of whether there's a potential injury, right? Yes, Your Honor. So it's a non-frivolous injury. And in this particular case, the injury is immediate. The injury is real. Another factor that the courts can look at, which was not looked at in this particular case below, is inconsistent judgments or the risk of inconsistent results. In this particular case, we can't forget that we have a 2008 Nuremberg decision out of the Hungarian court, which found the Hungarian state to be the rightful owner of 11 of the artworks that are in dispute here today. But that's not part of it. That's not an issue. I have some other questions, but I think Judge Pillard has some questions about this subject. So I'm going to change the subject again when she's done. I think you largely clarified it in the last colloquy. My only question was really along the same lines as what Judge Tatel was asking. In Pimentel and Kickapoo, the absence of sovereign's interests were not precisely aligned with any defendant remaining in the case. So those cases only take you so far, right? They don't answer the question, what is the effect of the sovereign status of a defendant that's immune on the ability of the case to go forward if and when there is a remaining defendant who, by hypothesis, if we're reaching the Rule 19 question, the remaining defendant who is not immune. If those interests are aligned, then I'm just wondering what your position is of what the immunity, what role the immunity could play there, given, as just Judge Jackson pointed out, the FSIA contemplates a situation in which an agency or instrumentality of a sovereign state may be an appropriate defendant. Yes, so there is no question that an agency or instrumentality may be the proper defendant of a case in which the sovereign has been found immune. In fact, we are litigating that very case involving the Spanish government in Casilla versus Tiza and Bornemisa, where the Kingdom of Spain was dismissed. But the foundation, which is an agency or instrumentality, owns the artwork, and therefore the case is proceeding against the Tiza and Bornemisa Museum. In fact, cert was just granted to look at this particular case. But here, the Hungarian state has retained ownership. So we're not asking this court to eviscerate the situation in the Foreign Sovereign Immunity Act where an agency or instrumentality is properly before the court for acts that it committed or property that it owns when it can give relief in connection with that case. But in this particular circumstances, these historical facts all derive from acts of the Hungarian state under Hungarian state statutes, under violations of international law, which only the Hungarian state can undertake. MNV did not exist at the time that this case proceeded. By plaintiffs' own experts' contentions, the Treasury Asset Department, which was involved before, was a state entity, was a.k.a. the Hungarian state. You can't ping pong between, one, finding Hungary immune and the MNV, a non-Hungarian actor or non-Hungarian government entity, and now it's an agency instrumentality so that you can then bootstrap the sovereign immune entity back in. I think, I mean, you make a clear case, it's helpful, but it sounds to me like a case on the merits. It sounds to me what you're saying is Mrs. Beninati is barking up an empty tree, and at the end of the day, she's not going to be able to get any relief. But I guess the question is under, I think I understand their theory, is that under at least the conversion and contract claims that there is a way to get relief against the current holders, even if they aren't the title owners of property. But isn't that a merits issue? We can't decide this question based on a merits determination that has yet to be reached in the district court. Rule 19 instructs us that you can only go so far into the merits before you have trampled on the immunity of the foreign sovereign. I'm trying to avoid the merits. Well, I am too, quite honestly, Your Honor, because what is at issue at this point is whether or not the Hungarian state can be in the case. Now, we submit on the merits the Hungarian state is the owner of the property under Hungarian law, but you can't go to do that analysis. Furthermore, the court in doing the analysis was factually incorrect. When they looked at the context of a bailment, the court cited to one document, one document, in which the party to that document was the Hungarian state. And that particular document, which formed the basis of her bailment or contract arguments, dealt initially with what leaves only five cases, five artworks that are in this case. We have 41 artworks in this case. We have three particular lines of defendants or plaintiffs, Your Honor, only one of which is U.S. based. So what the court did was did a merits, a premature merits analysis that was factually incorrect to find a conceivable bailment over five artworks and then utilizes that to allow a case to go forward over 41 artworks, 11 of which which have already been addressed in the Hungarian courts, which will leave us with inconsistent decisions. Mr. Stauber, can I just ask you before Judge Tatel shifts us to a different line of questions. I'm struggling to understand if you're right about how this works and the fact that MNB is not the owner of the property and that's relevant in your view to whether or not we can proceed. Why isn't it the case that that foreign states can't always just sort of set up these corporations and retain the ownership of the assets for the purpose of evading the responsibility in this way? I thought that the expropriation exception to the FSIA was Congress's clear intention to allow for actions concerning the ownership of property by foreign states and their instrumentalities to go forward so we can get to the bottom of this kind of situation. And what you're doing, I think, and you can tell me I'm wrong about this, but what your argument is constructed to prevent, I think, the very thing that Congress intended by creating this exception to immunity, and it ultimately reduces to as long as there's a case in which the other elements of Rule 19 might allow for the case to go forward, you say, because to allow it to go forward, it injures Hungary because it has immunity. And I just don't, I don't understand how that is. So am I wrong about the fact that under your conception, we'll never have another case like this again? Yes, Your Honor, I submit you are wrong, but I don't think that I understand your struggle here. I understand your thought process, if I might. What we are not saying is that the Foreign Sovereign Immunity Act is a full stop stop whenever you find that the foreign sovereign is immune. But what we are saying is that as the lower court itself conceded, MNV was not set up for some nefarious purpose. MNV was not set up to hide assets of the Hungarian state. It was not put together to conduct unlawful business on the Hungarian state's behalf, so that it could do that and then flee back behind its borders. That's not at all what has happened here. Under this, you have to look at the facts of this particular case. These are artworks, property that have been in the Hungarian state's ownership since shortly, since after World War II. MNV didn't even exist at the time. MNV exists post 1989. MNV has not done anything in connection with this case. If they had, we might have a different analysis here, Your Honor. And as I point out, if the agency or instrumentality is itself conducting the commercial activity, which is the hook for the Foreign Sovereign Immunity Act, which it's not here because we know it has no direct effect in the United States, or if the foreign sovereign which owns the property itself is subject to jurisdiction under the violation of international law point, then you would properly have this case going before the U.S. courts with Hungary in it. But in this particular situation, as Judge Cato authored in this court's opinion, the Foreign Sovereign Immunity Act, as the Solicitor General has also told us, recognizes when the property is in the foreign sovereign, and the foreign sovereign is the party, they are immune from this particular case. So, like I mentioned, it's not a full stop. But here you have a situation where, unlike the other cases that have been cited in mine safety, where you said with the court, this court says, the Supreme Court says, you can't use a stand up party to get at the United States governments, or in this case, the Hungarian government's national treasury. You can't risk having inconsistent decisions over property ownership. And you have to look at the subject. We're not saying it's a full stop, Your Honor. All right, Judge Jackson, does that answer your question? Yes, thank you. Okay, so I just have two, two kind of unrelated questions. One, I'll take you back to an intriguing point you made about a half an hour ago about this, about whether this property is commercial. And you said we need to take account of the fact that this is a former communist country. And I'm interested, I haven't heard that argument before. First of all, do you know any cases which say that how we define commercial property or commercial activity depends on, you know, the structure of the government involved in the case, whether it is or was a communist country? Do you know of any case that says that? No, Your Honor. What I'm providing here is some historical context, which I think is important. I'm trying to figure out whether your historical, I'm trying to figure out whether your historical context is relevant. And my question is, why would, why would the American courts, why would the, why would, I mean, your point is, is that a commercial activity in, something that's a commercial activity in the United Kingdom might not be a commercial activity in the same thing. Operating a bowling alley might not be the same thing in Hungary. Hungary, communist government might want to operate all over the country's bowling alleys, right? That's your point. We have different governance systems. We have different economic systems. Yes. Okay. Is that what you're telling us, that if a Hungarian, if a communist country decides to operate the country's bowling alleys, which may in fact be the case, that when an American court is looking at the core government function, we have to say, well, that's a core government activity, whereas it's not in the United Kingdom. Is that your point? My point is that we have to take into consideration the historical context of each country, its legal system, and its political background. And that is being ignored here. And in fact, Pemintel tells us when the claims arise from historically and politically significant events, in this case in Hungary and its people, while the plaintiffs, yes, in this particular case, have a unique interest in resolving the matters of the ownership. It's a specific affront to the Hungarian state to proceed with respect to addressing historical issues only it can handle. That doesn't answer my question. But let me, my last question is, so the Supreme Court's decision in Republic of Germany v. Philips that came down during the briefing of this case, does that have any effect on this court's jurisdiction in its current posture, this case? Your Honor, we would submit that in this particular case, what that decision did was it also vacated the underlying decision of international comedy. Okay, so now international comedy is back on the table in connection with this case. So yes, it has to do with the jurisdiction. And in fact, when you look at the Rule 19 factors, one of the factors to consider is an alternative forum. Judge Ruvel herself submitted that in the context of a foreign sovereign where there is an alternative forum for Rule 19 may or may not be a factor and is quite de minimis. What about the court's interpretation of rights and property taken in violation of international law? Well, Your Honor. Does that have an effect on this case? We would submit that it does have an effect on this case, Your Honor, and that'd be an issue we'd be happy to further brief or have addressed further on remand. No, no, no. You don't argue anywhere in your brief that it does, right? We don't argue anywhere in our brief that it does at this point in time, Your Honor. Correct. So the position of the Hungarian government at this point in this case is that that case is not relevant to the fundamental jurisdiction of the courts here, right? At this particular, yes, Your Honor. All right, fine. Thank you. Unless either of my colleagues have a question, we'll hear from from counsel for the families. Okay. Morning, Your Honors. Alicia Beninati from Casa Benson for plaintiff. David DeChapel, Angela Herzog and Julia Herzog. I think Your Honors have touched upon the critical issues here, which are that M&V, as explained in the declaration of our expert, Dr. Shulmani, is most certainly an entity whose core functions are commercial in nature. Now, defendants purposefully created M&V as a joint stock company in order to take advantage of commercial law in Hungary, in order to be able to operate in the marketplace in the post-communist era. And now they seek to declare that M&V is still part and parcel of the state itself, while their own courts have found that as a joint stock company, M&V operates in the same way as other joint stock companies in Hungary and does not get any favorable treatment. The defendants never raised Rule 19 as an argument when they asked this court to dismiss Hungary from this case four years ago. Instead, when we went back to the district court on remand, they brought up Rule 19 for the first time and said that now that Hungary was out of the case, the entire case should be dismissed. The district court correctly rejected that argument, finding that the museums, not only as joint tortfeasors, but as parties to express and implied bailment agreements, can be held responsible on their own for their possession and control of these artworks over the last 50 years and be liable, at the very least, for damages. How do you respond to Mr. Stauber's argument that in this case, the artworks at issue are still owned by the Hungarian government, so that the remedy that you're seeking really cannot come from M&V? We have two points on that, Your Honor. Hungary claims to be the owner of the artworks. Obviously, we do dispute that they ever validly acquired an ownership interest as opposed to a possessory interest. They seized the artworks during World War II. As this court found on the last appeal, at least 25 of them were never returned in any way, shape, or form to the family. As the district court found, even as to a handful that were supposedly returned, they weren't really returned. Hungary's been holding the bulk of these artworks since the Holocaust. They claim to have acquired ownership in one form or another. We would say they never did. At best, there's an implied bailment relationship here. Assuming that Hungary owns the artworks for present purposes, is he right about the legal point in terms of what that means concerning M&V being the proper defendant or a defendant that can give you relief? Yes. M&V manages the artworks on behalf of Hungary. Hungary is the owner. However, Hungary has delegated to M&V the right to make decisions with respect to artworks that they own. As we cite in both the Declaration of Dr. Petou and it's mentioned also in the Chalmedy Declaration, that M&V has the authority to make decisions with respect to certain state assets they have in this case. It is M&V who was responsible for returning, M&V's legal predecessor, but essentially M&V was responsible for returning works of art to Martha Nirenberg back in 2000 when the Nirenberg litigation was ongoing. Without the involvement of the sovereign state of Hungary? Hungary was involved in the case, but according to the 30B6 witnesses of defendants who appeared in this case, specifically Dr. Molnar, he was the one and he is an employee currently of M&V who was responsible for that decision. So it's your position that were you to succeed against the museums and against M&V that M&V would not need any authority or assistance from Hungary in order to comply with the judgment that you would hope to attain? That is our position, Your Honor. And at the very least, you know, we have not conducted expert discovery yet in this case, and if expert discovery shows otherwise in that regard, at the very least, the museums and M&V can be held liable for monetary damages, even if they are not ultimately able to return possession of the artworks. I think I have a couple of questions. To me, this case turns on what Pemintel means, which is not easy to figure out, to be honest, but let's try here. Okay, I want to read you a sentence from Pemintel and then ask you a couple of questions about it. The court says, where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the absent sovereign. Now, two questions. You're not saying Hungary's claims to this artwork are frivolous, right? We are not. You think they're wrong, but they're not frivolous, right? Correct. Okay, so this case then turns, and I'm just looking at Pemintel, nothing else now. So, this case turns on whether there's potential for injury to the interests of Hungary. Potential for injury, right? That's the standard. That's what we have to ask for this case, correct? Yes, but... We'll go ahead, finish your sentence. What's wrong with that? That's the question we have to decide. Is there potential for injury? Potential, not for sure, but potential, right? The Pemintel court made that statement, but then went on to analyze the Rule 19b factors, because that is how you determine whether... It's a fairly difficult opinion to understand, but as I read what it said in the paragraph or two after that, what it was really focusing on was whether or not the claim was frivolous. Remember, it said the district court was wrong about the statute, or it could have been wrong about the statute of limitations in New York. Case might have come out differently if the Philippine government brought a different kind of case. Basically, they were saying that it wasn't frivolous, but I agree with you, you do look at the other factors, but given Hungary's argument here that these paintings belong to it, and I can see that that's an argument, they may be wrong, and you say it's not frivolous, and that MNV cannot on its own satisfy a judgment. How could we say that there's no potential injury to the absence of, no potential injury to the absence of? I don't think the cases that have followed Pimentel in the years since have interpreted sovereign immunity that narrow. I mean, it's basically what Mr. Stauber is effectively arguing for is an almost absolute rule that if a foreign sovereign has a non-frivolous interest, the case has to be dismissed. No, no, no, I asked him that question, remember, I asked him that question, because that's what he says in his brief, but he says, no, no, he's not really saying that, he's saying courts are free to look at these other factors. But, so let me ask you the question this way. Hungary says in its brief that there is no reported case where an absent, there's no important, there's no case that has allowed to be, that has continued, where there's an absent sovereign without, with a non-frivolous argument. Is he right about, do you know of any case, I haven't found it, but maybe you know of one, where other than the district court here, do you know of any case where a court of appeals or the Supreme Court allowed a case to go forward under 19b when there was an absent sovereign with a non-frivolous claim to the property? Do you know of any case like that? I don't, but I'd like to make a few points on that, in that there have been a number of cases involving sovereigns of one form or another, the Indian tribe cases being the most common of the cases where the courts have clearly examined the Rule 19b factors and have focused on whether there is another party aligned with the interests of the sovereign who can represent their interests, or whether alternative remedies are proposed that can be used to shape the judgment in such a way. And in fact, the Pimentel Court noted that in their decision, they said that in that case, they expressly noted that no alternative remedies had been, or forms of relief had been proposed. But then they went on to cite a paragraph from Wright and Miller collecting a number of cases in which the granting of money damages rather than specific performance or the use of declaratory judgment and other available remedies could be used to overcome a situation where, you know, otherwise the action might not be able to proceed. The second thing I would like to note, and this kind of turn, this goes to the point on the expropriation exception itself, is that... Before we go to the expropriation exception, let's just continue on Pimentel here, because I hear what you're saying, and I take your point about all of this, but I read Pimentel, it's not just one point where it says potential for the injury. It says, at another point, it says, it talks about injury that, quote, could result to the sovereign, and then it says, it said, the lower courts in that case ignored the substantial prejudice those entities would likely to incur. In other words, I read, and the court used those conditional words at least three times in this decision. And so, and it says, I mean, the court starts by saying, case may not proceed when a required sovereign is not amenable to suit. I mean, the whole tone of Pimentel is, if you've got an absent sovereign, the case can't proceed if there's any reasonable likelihood that its interests could be harmed. Now, we may agree or not agree with that, but that's the Supreme Court. And given that approach the court has taken, I need to hear from you how we could conclude that there isn't any potential injury to Congress. I mean, you could say, well, there might be other remedies, okay, and you might be right about that, but what the court went on to do in Pimentel is tell us, we just can't explore that in any depth. We're getting too much into the case if we do that. See my point? So I'm really troubled by Pimentel. I see your point, Your Honor. Yeah. But the court did say you can touch upon the merits necessary, to the extent necessary, to resolve the Rule 19 issues. I agree. Let's suppose that the case proceeds against the museums and MND, and if the district court concludes in the end that it cannot order the return of artworks without Hungary's involvement, there is no evidence that Hungary will be prejudiced if the museums are simply asked to pay damages for their own roles as separate independent agencies and instrumentalities of Hungary who have, by their own conduct, impacted and impaired plaintiffs for decades by having the use and benefit of these artworks to draw tourists into the museums, to take these artworks on the road, to elevate their international profiles. If the museums can be held liable for damages in their own right, there is no prejudice to Hungary because they are being held responsible for their own conduct. Ms. Beninati, their own conduct, though, is only wrongful if something that Hungary did in the past was wrongful. And that's more of a perhaps dignitary or reputational injury that I actually don't think the brief has separately, Mr. Stauber's brief doesn't separately isolate it. The implication of a damages holding against the museums and MND does pass some shade, as the kids would say, on Hungary. Do you have any case that says that that is not the kind of interest that would defeat the case proceeding under Rule 19B based on alignment of interest? Is there any case that assures us that that doesn't matter, that there's plenty of energy in the defense of the defense interest here, and we shouldn't worry about that? I don't have a specific case on that point, Your Honor, but I would note that outside of the sovereign context, this circuit for many decades now has recognized that even where there is a claim involving the owner of property, if there are joint tort feasors involved, those joint tort feasors can be held liable for their own conduct. I'd point to, it's an old case, 1953 Ward v. Devers, 203 F. Second 721, where the owner of a building was found to be a required party for a rescission suit, but a fraud claim for damages was allowed to proceed against other defendants, even though that party was unavailable. This comes up in the context, again, of where in Pimentel the court pointed to the fact that in that case, you know, there was no alternative remedy proposed. In all of these other cases as well, we have a very unique situation here where Hungary's interests have been represented by MNB in this litigation from day one. MNB is the only entity that has provided, you know, 30p6 witnesses for deposition in this case. They've hired Mr. Stauber's firm, they've been paying the bills, they've made every decision in this litigation from day one. So Hungary's interests are represented by their agent in this case in a way that we don't have in any of these other litigations that have arisen in the really not so many cases that involve Rule 19 and sovereign immunity. And just to turn briefly to the statutory language of 1605, I'm not trying to get away from Pimentel, but I just want to emphasize that the expropriation exception refers to property being owned or operated by an agency or instrumentality of a foreign state as a basis for jurisdiction. So the statute itself that Congress enacted clearly contemplates a situation where you may have property that is owned by the foreign state, but operated by an agency or instrumentality, and that therefore the agency or instrumentality as the operator can still be subject to jurisdiction in the United States. I think if Congress had believed that every time property is owned by a foreign state, it has to be present in the U.S. or there's no claim, they would not have worded 1605A3 the way that they did. And that plays into the Rule 19 arguments here because Rule 19 does not preempt the FSIA. It works in conjunction with. Well, but you must concede Pimentel tells us how to interpret Rule 19A and B in the context in a case where you have an absent foreign sovereign, right? Yes. That's why I keep coming back to Pimentel. I mean, when I started looking at this case, I was, you know, focused like a laser on, like you, on Rule 19 and on FSIA, but the more I dug into the case and the more I read Pimentel, I just kept coming back to its language because it's the Supreme Court and it's telling us how we interpret these two statutes, these two provisions and read them together. Right? Yes. Right. But I would also note that in Pimentel where the court made those comments, it was uncontested in that case that that the entity was a required party under Rule 19A. There was no dispute about that in that case. So the court was under a slightly different set of facts, whereas here the district court assumed that to be the case, but we have disputed that. All right. Okay. Anything else you'd like to say? Unless Your Honor. Nope. Nope, I don't think so. Thank you, Mr. Stauber. You can take one minute. The Pimentel focus, Your Honor, and you're a judge who's uniquely positioned in this case, having been with us for now, I guess, a third oral argument. You don't have to remind me. Do not. It's a 2008 case, Your Honor, which, as you point out, is the one and only case which weaves in both the Foreign Sovereign Immunity Act and Rule 19. And it states, consideration of the merits of plaintiff's claims, namely, in this case, whether Hungary owns the artwork, quote from Pimentel, is itself an infringement of sovereign immunity. That's a pretty strong argument, Your Honor, focusing on Pimentel. But we'd also like to point out that the argument that the Hungarian MNV is delegated and is able to make decisions with respect to alienation of this property is factually not correct, and it's not consistent with the record, and it's not consistent with prior practice. The joint appendix at 228 references and cites the February 3, 2000 letter in which the work, Bust of Christ, was returned, in fact, to the family. At the time, it was the Treasury Asset Agency in that seat. It was the Treasury Asset Agency that made that action, which the lower court and everybody else seems to have conceded was, in fact, the Hungarian state. But even then, even then, Dr. Molnar testified that, in fact, he had to check with, and the letter references, the Ministry of National Culture, Heritage, and the Asset Treasury Agency. So that, as an example, tells us anything that it's the Hungarian state that has to make that decision. Furthermore... Robert, can I ask you a question, because I know that, and I appreciate Judge Tatel's lines of questions about Pemintel, but I just want to clarify, Pemintel did not involve the expropriation exception, did it? No, it did not, but that's not in any way relevant or inconsistent to the argument here. Let me help, or maybe you can help me to understand why that's not relevant, because I thought that part of the reason why we're in this scenario is because the claim of immunity is bound up with the expropriation exception in this case. So, this court has previously held that Hungary is not in, Hungary retains its immunity per that exception, and we're focused now on the second clause of that exception, so it seems to me that that exception is always relevant because it provides the backdrop against which we are evaluating. It's sort of the starting point for the Pemintel analysis, in a sense, right? The sovereign immunity is coming in the context of this expropriation exception. Am I wrong about that? Like, we can't set that completely aside, can we? Well, but if you look at the context of the purpose of that particular provision, which says that, and the Solicitor General supported this point, is that when the property is in the boundaries in the sovereign states' territory, and it involves a violation of international law, you cannot take jurisdiction over the foreign sovereign for an expropriation exception. If, as is argued here, because you have an agency or instrumentality that doesn't own the property, only manages the property, or only displays the property, is allowed to pull the sovereign back in, then immunity is eviscerated. Right, but what I'm worried about is that the reason why I'm focused on this and saying we can't take this exception completely out of it is because this exception appears to understand the circumstance that you're worried about and account for it. There is a second clause in this exception, which completely, as Ms. Venenati points out, foresees a circumstance in which you have an agency or instrumentality that operates the property at issue, and it appears that Congress is still allowing for suit under those circumstances. So what worries me is the reading of Pimentel in a context that does not involve this exception to essentially undermine the second clause that in this world is allowing for a suit of this nature. So allowing for the suit for jurisdictional purposes and allowing the suit to proceed or not to proceed under Rule 19 are two separate and distinct things. Foreign sovereigns are not the only parties that have access to Rule 19. Rule 19 applies in any context. What Pimentel informs us is that when you have foreign sovereign immunity, you have a more circumscribed approach to Rule 19. But what you're saying is that, I think, is that Rule 19 operated as you interpret it under Pimentel would eliminate the category of cases under 1605A3 second clause in which an instrumentality or agency of a sovereign immune state operated property in a commercial way. Why would Rule 19 in your reading not always apply in a case like that where the sovereign is immune because the first clause doesn't apply, but an agency or instrumentality is still in the case operating property. And on your reading, sorry, sovereign interest Trump's case goes away under Rule 19. I can't think of a situation in which that wouldn't be the case, but I'm sure you've thought about it longer and harder than we have. Your Honor, so we're not saying that it's a full stop-stop. In the facts at hand, though, because the Hungarian state treasury is the one that will be not only potentially injured, but directly injured, then Rule 19 counsels for dismissal. Why isn't that just Rule 19A? I mean, the first part of it, it just seems like, and that's hardly disputed. I mean, the district court just assumed that yes, Hungary's interests would be impaired. Yes. So that's honored. And that's as far as Pimentel gets. And there isn't a claim in Pimentel that, oh, wait, under the second inquiry, under Rule 19, is there a party that's persisting in the case that protects its interests? I mean, that's just beyond what Pimentel decided because there was no such entity in that case with an aligned interest as there is here. So we're just in territory that Pimentel doesn't chart, are we not? No, I don't think we are, Your Honor. The reason we're not in that territory is because, in fact, what the Foreign Sovereign Immunity Act was not set up to do was to drag foreign sovereigns into our courts simply because they have agencies or instrumentalities that may be out in the commercial world acting or managing their property. But isn't that exactly what this provision says? It says you can take jurisdiction over the agency or instrumentality. We're not here disputing that you can't or cannot take jurisdiction over the museums. We dispute you can't take jurisdiction over M&B, but you can take jurisdiction over the museums. But that in and of itself is not the stop. You then have to do the analysis under Rule 19, which tells us that because of the facts and circumstances here, unlike American trucking, which the court cited, where you had a sovereign, it wasn't a foreign sovereign immunity, but you had a sovereign, and the court looked at, well, the New York Attorney General is in the case. The impact is downstream at best. There is an independent budget that the New York Thruway has through which any potential penalties could or could not be paid. So ultimately, you won't injure the state. I would agree with the court's struggle that it seems like a harsh outcome in a case that has gone on for 10 years, which is then remanded, and you later add an agency or instrumentality that's not alleged to do anything, and you bring the case back alive, ultimately having to render a judgment against the Hungarian M&B, which can't fulfill it, or the museums, which can't fulfill it. If the museums can't display the artwork, that harms Hungary. Hungary will have nowhere to put these artworks if its agency or instrumentality can't display the artworks. The other point is that Hungary loses, and that probably is what justice requires, and by hypothesis, we're in a situation in which M&B and the museums have lost. But we also have to reflect and look at Hungarian law itself here. In the Segré case, which was cited by the district court and by the plaintiff, which was a lower court case under a Hungarian statutory system, which does not have precedential value, in which the Hungarian state, we don't have an interest in the particular artwork, so the case proceeded without it. But in this very case, in 2002, when it was first brought in Hungary, the Hungarian court stopped it and said, wait a minute, two of the interested plaintiffs are not in the case. You have to have everybody in the case, you have to have the required parties, so that we can provide full relief. The case stopped, the parties were brought in. Then you have an appellate court decision from the Hungarian higher court in 2012, which says directly on the point we're discussing here, which is M&B cannot substitute for Hungary, the owner, it is only a manager of the property, you have to have the Hungarian state in it. The Hungarian statutory code 130 dovetails along with Rule 19. It's not a happy result. We understand that the US courts, but they're not here to take and manage and hear cases over foreign sovereigns when the property is in their state and has not been in the United States. It's a tough outcome. But there is an alternative form in this case, Your Honors. There is the Hungarian courts. I think you're completely out of time, unless either of my colleagues has a question. We will thank you both for your excellent arguments this morning and take the case under submission. Thank you.
judges: Tatel, Pillard, Jackson